1  DEBORAH G. LEVINE
   CA State Bar No. 57607
2  Law Offices of Deborah G. Levine
   1299 Newell Hill Place, Suite 300
3  Walnut Creek, CA  94596
   Tel. (925) 933-5100
4  Fax  (925)933-5297

5  Attorney for THOMAS EDWARD GREEN

6

7                    **UNITED STATES DISTRICT COURT**

8              **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

9                        **SAN JOSE DIVISION**

10  THE UNITED STATES OF AMERICA,          )   **Case No. CR 08 00075 JW**
                                           )
11            Plaintiff,                   )   NOTICE OF MOTION AND
                                           )   MOTION TO MODIFY CONDITIONS
12  vs.                                    )   OF PRETRIAL RELEASE/ POINTS
                                           )   AND AUTHORITIES IN SUPPORT
13                                         )   THEREOF
    THOMAS EDWARD GREEN,                   )   Date:     June 9, 2008
14                                         )   Time:     1:30 p.m.
              Defendant.                   )   Dept.:    Hon. John Ware
15  _____)

16

17
    **TO:    UNITED STATES OF AMERICA, PLAINTIFF; JOSEPH RUSSONIELLO, UNITED**
18
    **STATES ATTORNEY, AND BENJAMIN KENNEDY, ASSISTANT UNITED STATES**
19
    **ATTORNEY**:
20
    PLEASE TAKE NOTICE THAT ON June 9, 2008 at 1:30 p.m. defendant will move to modify the
21
    conditions of his release.  This motion having been originally filed in front of the magistrate is being
22
    refiled in the district court to which this case is assigned AT THE DIRECTION OF MAGISTRATE
23
    JUDGE PATRICIA TRUMBULL.  This motion to modify is based upon the attached memorandum
24
    of law, attached declaration, exhibits,  and any evidence to be adduced at the hearing on this motion.
25
    DATED: May 9, 2008                          RESPECTFULLY SUBMITTED,
26

27
                                                DEBORAH G. LEVINE
28
                                        1

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## INTRODUCTION

3    The defendant, Thomas Edward Green, Jr., submits this brief in support of his request that

4 the court vacate electronic monitoring as a condition of his pretrial release.  This condition should

5 be vacated because Mr. Green poses no flight risk nor does he pose any danger to the community.

6 Knowing from November of 2006 that he could be indicted and potentially convicted and

7 sentenced for the present offenses, he remained at all times available to surrender to the court and

8 cooperate with the judicial process.  At no time since this investigation commenced in 2006 has

9 Mr. Green violated any law nor has he engaged in any inappropriate conduct either in the concrete

10 world or in cyberspace.  Since indicted, conditions of release have been imposed, and Mr. Green

11 has not once violated any of their terms and requirements.[1]

12    Thomas Green lives in San Jose.  He is the Director of Patient Financial Services for

13 Stanford University Medical Center, Lucile Packard Children's Hospital in Palo Alto.  His

14 services there are highly valued.[2]  He has earned a masters degree in business (MBA) from San

15 Jose State University.  In addition, Mr. Green is very dependent upon his ties to the area as a

16 patient at Kaiser Permanente where he sees his physician frequently and regularly and is

17 prescribed a complex combination of medications for a serious chronic illness.   Mr. Green has

18 never in his life been arrested before his arrest in this case.  Based upon these facts it is clear that

19 electronic monitoring is not necessary to insure the safety of the community nor to assure Mr.

20 Green's appearance.

21    Having established facts which support this request Mr. Green submits the following legal

22 arguments as to why his release from the electronic monitoring requirement is permitted:

23 1.    The mandatory conditions of the Adam Walsh Act (18 U.S.C. §3142(c)(1)(B)) do not

24    apply because: (a) the statute specifically excludes possessory violations

25

26    [1]See April 24, 2008 memorandum from pre trial services

27    [2]See attached letters and work evaluations

28                                         2

1    (18 U.S.C. §2252(a)(4)) from the list of offenses requiring pretrial electronic monitoring;

2    and (b) the alleged transmission offense in this case (18 U.S.C. §2252(a)(1)) occurred

3    before the Adam Walsh Act became law.

4    2.    The mandatory conditions of Adam Walsh do not apply because the Act requires there be

5    a minor victim and in the present case there is none.  Knowing that 18 U.S.C.§2252(a)(4)

6    offenses where excluded from the Act, Congress, in clear language added the requirement

7    that, "[I]n any cases that *involves a minor victim* under..." [listing included offenses] the

8    mandatory conditions, including electronic monitoring apply.  (emphasis added)  Since

9    possession of child pornography is not included in the list, the minors pictured in the

10   possessed pornography are clearly not the victims the amendment is referring to.  Only in

11   the listed offenses that "**involve a minor victim**" do the Walsh restrictions apply.  Under

12   the allegations of 18 U.S.C.§ 2252(a)(1), the transmittal offense, the minor victim would

13   have to be the recipient of the transmittal or in some other manner victimized.  Here there

14   is no assertion by the government that the pictures were transmitted to a minor.

15   Accordingly, under the Act's clear language, the mandatory pre trial release conditions do

16   not apply.

17   3.    If the Adam Walsh Act applies, it's failure to provide procedural safeguards render it an

18   unconstitutional violation of the due process clause of the Fifth Amendment, the excessive

19   bail clause of the Eighth Amendment and the separation of powers doctrine.

20   As such, the court should exercise its discretion to terminate electronic monitoring as a

21   condition of defendant's release.

22                    **STATEMENT OF FACTS AND PROCEDURAL HISTORY**

23   According to FBI reports prepared during the investigation of this case, Thomas Edward

24   Green was contacted by the FBI on November 16, 2006 at his home in San Jose, California.  FBI

25   Special Agent Wade Luders told Mr. Green on that date that he was "investigating inappropriate

26   pictures of children being emailed from an AOL account registered to [him]".  Agent Luders

27

28                                                        3

1   showed a picture to Mr. Green characterized as child pornography, which Agent Luders claimed

2   was emailed from an account registered to Mr. Green.

3        After speaking with Mr. Green, Agent Luders took a computer and USB hard drive

4   memory stick from Mr. Green's home.  On November 17, 2008, Agent Luders examined the

5   memory stick and found in that memory stick what he described as minors engaged in sexual acts.

6        As the result of the investigation, Mr. Green retained one counsel in November 2006 and

7   shortly thereafter retained a second attorney, who continues to represent him.  Mr. Green knew at

8   all times since November 2006 that the FBI investigation could result in a criminal indictment.

9   The government at all times since November 2006, knew that Mr. Green was represented and had

10  offered, through counsel, to self surrender whenever notified.  At no time does the government

11  allege that Thomas Green violated the law by either viewing or emailing child pornography after

12  his November 16, 2006 contact by the FBI.

13       Mr. Green is charged in a two count indictment as follows:

14       Count One alleges that on or about June 18, 2006, Mr. Green transported and shipped in

15  interstate commerce, by means of a computer, material involving the sexual exploitation of

16  minors, in violation of 18 U.S.C.§2252(a)(1);

17       Count Two alleges that  on or about November 17, 2006, Mr. Green possessed images of

18  one or more minors engaging in sexually explicit conduct, in violation of 18

19  U.S.C.§2252(a)(4)(B).

20       On February 21, 2008, the defendant was arraigned, entered a plea of not guilty and was

21  released from custody on numerous conditions which include electronic monitoring.

### ARGUMENT

23       On July 27, 2006, Congress enacted the Adam Walsh Child Protection and Safety Act of

24  2006 ("the Act"), which amended, inter alia, 18 U.S.C. §3142(c)(1)(B) to read as follows:  (c)

25  Release on conditions.-(1) If the judicial officer determines that the release described in Section

26  (b) of this section will not reasonably assure the appearance of the person as required or will

4

1   endanger the safety of any other person or the community, such judicial officer shall order the
2   pretrial release of the person…

3      (B) subject to the least restrictive further conditions, or a combination of conditions, that
4   such judicial officer determines will reasonably assure the appearance of the person as required
5   and the safety of any other person and the community, which may include the condition that the
6   person– [be subjected to any condition or combination of conditions listed in 3142(c)(1)(B)(i)
7   through (xiv)].  In any case that involves a minor victim under Section 1201, 1591, 2241, 2242,
8   2244(a)(1), 2245, 2251, 2251A, 2252(a)(1), 2252(a)(2), 2252(a)(3), 2252A(a)(1), 2252A(a)(2),
9   2252A(a)(3), 2252A(a)(4), 2260, 2421 2422, 2423, or 2425 of this title, or a failure to register
10  offense under section 2250 of this title, any release order shall contain, at a minimum, a condition
11  of electronic monitoring and each of the conditions specified at paragraphs (iv), (v), (vi), (vii), and
12  (viii).
13  18 U.S.C.§3142(c)(1)(B)(2006)(as amended).

14      Based upon this language, the magistrate imposed the electronic monitoring requirement
15  as a condition of defendant's pretrial release.

16  **A.    THE MANDATORY PROVISIONS OF THE ADAM WALSH ACT BY THEIR**
17  **TERMS DO NOT APPLY TO POSSESSORY OFFENCES IN VIOLATION OF 18 U.S.C.**
    **2252(a)(4), AS ALLEGED IN COUNT TWO OF THE INDICTMENT.**

18      The exhaustive list of offenses that trigger mandatory electronic monitoring specifically
19  excludes possession of child pornography in violation of 18 U.S.C. §2252(a)(4).  This exclusion
20  makes perfect sense: simple possession is the least serious offense of this type and as such has the
21  least severe sentence.

22      Because Congress specifically excluded those accused of violating Section 2252(a)(4)
23  from the list of offenses for which it mandates electronic monitoring, the mandatory provisions of
24  the Act do not apply to the offense alleged in Count Two of the Indictment.

25  **B.    THE ADAM WALSH ACT DOES NOT APPLY TO COUNT ONE OF THE**
26  **INDICTMENT BECAUSE THE ALLEGED CONDUCT OCCURRED BEFORE THE**
    **ACT TOOK EFFECT**

27

28                                          5

1    The conduct referred to in Count One is alleged to have occurred "on or about June 18,

2  2006" -- over a month before passage of the Adam Walsh Act.  Because the Act does not

3  specifically require retroactive application, the judicial presumption against retroactivity precludes

4  its application to Count One.

5    The judicial presumption against retroactive legislation is "deeply rooted in our

6  jurisprudence."  *Landgraf v. USI Film Products* (1993) 511 U.S. 244, 265.  As the Supreme Court

7  has stated time and again, "[e]lementary considerations of fairness dictate that individuals should

8  have an opportunity to know what the law is and to conform their conduct accordingly; settled

9  expectations should not be lightly disrupted."  Id.

10    It is the judicial system, rather than the legislative process, that is best equipped to identify

11  past wrongdoers and to fashion remedies that will create the conditions that presumably would have

12  existed had no wrong been committed.

13  Id. at 267.

14    This rule requires clearly stated legislative intent before a statute can be applied to conduct

15  that occurred before its passage.  "Since the early days of this Court, we have declined to give

16  retroactive effect to statutes burdening private rights unless Congress has made clear its intent."  Id.

17  at 270.  "Requiring clear intent assures that Congress itself has affirmatively considered the potential

18  unfairness of retroactive application and determined that it is an acceptable price to pay for the

19  countervailing benefits." Id. at 272-273.  Thus, courts will not apply statutes retrospectively "unless

20  compelled to do so by language so clear and positive as to leave no room to doubt that such was the

21  intention of the legislature."  Id. at 271 (emphasis supplied) (see also *Miller v. United States* (1933)

22  294 U.S. 435, 439 ("the law is well settled that generally a statute cannot be construed to operate

23  retrospectively unless the legislation to that effect is unequivocally clear.").

24    The array of statutory schemes to which the presumption is applied is quite broad.  It includes

25  any provision that "takes away or impairs vested rights acquired under existing law, or creates a new

26  obligation, imposes a new duty, or attaches a new disability in respect to transactions or

27

28                                                6

considerations already past." *Marrie v. SEC*, 374 F.3d 1196, 1207 (D.C. Cir. 2004). Under this scheme, it has been applied to strike down retroactivity of statutes and regulations restricting immigration (*Chew Heong v. United States* (1884) 112 U.S. 536), imposing new monetary obligations on the government (*United States v. Magnolia Petroleum Co.* (1928) 276 U.S. 160), clarifying the definition of "improper professional conduct" prerequisite to the imposition of SEC sanctions (*Marrie, supra*, 374 F.3d at 1207) and setting caps on Medicare reimbursable wage costs (*Bowen v. Georgetown University Hospital* (1988) 488 U.S. 204, 207).

The only two recognized types of legislation to which the presumption against retroactivity may not apply are changes to rules of procedure that do not affect primary rights, and statutes that confer new rights or relief. See, e.g., Ex Parte *Collett* (1949) 337 U.S. 55, 71 (governing the transfer of civil actions); *Thorpe v. Housing Authority of Durham* (1969) 393 U.S. 268 (requiring notice to FHA tenants before eviction).

The mandatory release conditions of the Adam Walsh Act falls within neither of these categories. Because it imposes significant new duties and obligations, it must be presumed to be prospective absent unequivocally clear legislative intent to the contrary.

The Act contains no such statement of legislative intent. To the contrary, it is entirely silent on the issue of retroactivity. Nor do the applicable provisions of Public Law 109-248 -- which codified the changes to Section 3142 -- contain any such language (see Public Law 109-248, Section 216). In contrast, the legislation does contain "effective date" language in other provisions (see sections 129(b) and 152(c)). This demonstrates that Congress intended the Act's mandatory release conditions to be applied prospectively only.

The presumption against retroactivity is in accord with the canon of statutory construction that favors interpretations which avoid the adjudication of constitutional questions. *Landgraf, supra*, 511 U.S. at 268. Retroactivity can implicate the constitutional protections against ex post facto laws, bills of attainder and laws impairing the obligations of contracts. Id. at 267. Retroactive application of The Act's mandatory electronic monitoring provision, by imposing significant new burdens upon

7

pretrial release, does in fact implicate the prohibition against ex post facto laws. See, e.g., *Plyer v. Moore*, 129 F.3d 728 (4th Cir. 1997) (holding that a new state law excluding certain offenders from consideration for supervised release violates ex post facto); *Sheppard v. La. Board of Parole*, 873 F.2d 761, 764 (5th Cir. 1989) (adding new supervision costs to supervised release violates ex post facto).

In sum, because the mandatory release conditions of the Adam Walsh Act fail to include an express retroactivity provision, their burdens must be construed as prospective only. Because the conduct alleged in Count One occurred before passage of the Act, the mandatory conditions of pretrial release do not apply.

**C.    THE ADAM WALSH ACT DOES NOT APPLY TO THE TRANSMISSION CHARGE BECAUSE THE OFFENSE DID NOT "INVOLVE A MINOR" WITHIN THE MEANING OF THE ACT**

The amendment to the Bail Reform Act imposed by Adam Walsh clearly states that only "[i]n any case that involves a minor"... certain mandatory conditions of pre trial release shall be imposed in the specific list of offenses. Because 18 U.S.C.§2252(a)(4) is not in the list (the possession charge), and because that section penalizes the possession of child pornography, clearly possession alone is not considered a crime that "involves a minor". Congress wrote the language very clearly. It could have omitted the exclusionary language "involves a minor" before the list of offenses but it did not. If Congress intended simply to impose the more restrictive conditions on all persons charged with any of the listed offenses, it would not have limited the list to include only those offenses that involve a minor.

As one court has recently stated regarding these same amendments:

As a general matter, the meaning of a statute is found in the actual language used therein. This is precisely how a legislature gives expression to its wishes. When the language of a given statute is plain, "the sole function of the courts is to enforce it according to its terms."*United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (citation and internal quotations omitted). To this end, "courts must presume that a legislature says in a statute what it means and means in a statute what it says." *Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253-54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992).

*United States v. Kahn* 524 F.Supp.2d 1278 at 1282 (2007, W.D.Wash.).

In *Kahn*, the defendant was charged with a single count of soliciting a minor to engage in illicit conduct. However, rather than a minor being involved, an adult decoy was used by law enforcement in an undercover operation. The adult undercover police officer said she would provide a child for the defendant to have sex with. But because the child was fictitious, the court found that the crime did not "involve a minor victim" as required by explicit language of the Adam Walsh amendments to the Bail Reform Act.

When language is clear, as it is in the Adam Walsh amendments, to the Bail Act there is no need to look to the legislative history. In *Kahn* the court found the same language in question here ("in cases involving a minor victim") to be unambiguous. Accordingly, the court held that the legislature created a clear condition precedent (that the case involve a minor victim) to the application of the mandatory release requirements.

**D.    THE MANDATORY CONDITIONS OF THE ACT VIOLATE THE PROTECTIONS OF PROCEDURAL DUE PROCESS, THE PROHIBITION AGAINST EXCESSIVE BAIL AND THE SEPARATION OF POWERS DOCTRINE OF THE UNITED STATES CONSTITUTION**

If the court determines that the mandatory release conditions of the Act do in fact apply in this case, it must then determine whether those provisions violate any constitutional principle. As one court already has ruled, because the provisions apply to broad categories of defendants without any individualized inquiry, they violate the Fifth Amendment's right to procedural due process, the Eight Amendment's excessive bail clause and the separation of powers doctrine.

**1. Excessive Bail**

The Eight Amendment to the Constitution commands that, in criminal matters, "excessive bail not be required." U.S. Const., Amendment VIII. In the federal system, criminal

defendants continue to enjoy the presumption of innocence in setting conditions of release. See 18 U.S.C. §3142 (j) ("Nothing in this section shall be construed as modifying or limiting the presumption of innocence.") Thus, historically, the right to be released before trial was conditioned only upon "the accused's giving adequate assurance that he will stand trial and submit to sentence if found guilty." *Stack v. Boyle* (1951) 342 U.S. 1.

Since the Court decided *Stack* in 1951, it has recognized that the function of bail, though limited, also includes ensuring the safety of the alleged victim and the community. *United States v. Montalvo-Murillo* (1990) 495 U.S. 711, 714. However, when conditions are imposed upon release for this purpose, they must not be "excessive in light of the perceived evil." *United States v. Salerno* (1987) 481 U.S. 739.

In *Salerno*, the Supreme Court upheld a facial challenge to the Bail Reform Act's provision allowing detention to ensure public safety, but only because the Act contained "numerous procedural safeguards [that] must attend an adversary hearing." *Salerno*, *supra*, 481 U.S. at 754. Such protections are manifestly absent from the Adam Walsh amendments.

In *United States v. Crowell*, Slip Copy 2006 WL 3541736 (W.D.N.Y), the court held that the mandatory release provisions of the Act violate the Eighth Amendment. Under the *Salerno* formulation, the court weighed the additional conditions of release (home detention, electronic monitoring, curfew restrictions and no contact orders) against the interests the Government seeks to protect, "including protecting children from potential sexual abuse and exploitation through the creation of pornographic images for distribution." Id. at p. 15. The court found the Government's interest insufficient to justify the blanket imposition of such conditions on all defendants charged with any of the listed crimes. The imposition of such

10

conditions on all defendants charged with certain crimes, regardless of the personal

characteristics of each defendant and circumstances of the offense, without any consideration of

factors demonstrating that those same legitimate objectives cannot be achieved with less

onerous release conditions, will subject a defendant, for whom such conditions are, in the

court's judgment, unnecessary, to excessive bail in violation of the Eight Amendment. *Crowell*,

*supra*, at pp. 15-16. The court specifically relied upon the *Salerno* Court's reasoning, and the

glaring discrepancy between the individualized determination required for detention and the

sweeping mandatory conditions of release for all defendants charged with any of the listed

offenses.

   While the Bail Reform Act directs that on the Government's motion, the court must

consider pretrial detention for particular offenses and defendants, despite the fact that as to

certain offenses there is a presumption that detention be imposed, the Act ultimately leaves the

question to judicial determination. Moreover, in *Salerno* the Supreme Court's upholding of the

authorization of pretrial detention by the Bail Reform Act turned expressly on the fact that the

statute does not require detention be imposed in every case based solely on the defined predicate

offenses. *Crowell, supra*, at p. 14. In *Crowell*, the court did in fact hold such a hearing, after

which it determined that the conditions of release necessary to ensure the defendant's presence

and protect the public were less stringent than those required by the Adam Walsh Act. Id. at pp.

16-17. Based upon the facts presented at the review hearing in Mr. Green's case, lesser

restrictions will clearly be found adequate.

   A finding that blanket application of the Act's mandatory release provisions is

"excessive in light of the perceived evil" finds further support in the complete absence of any

11

congressional findings or debate prior to passage.  The mandatory release provisions were part

of an amendment proposed by Senator Hatch only seven days before the bill's final passage.

152 Cong. Rec. S8012-02 (daily ed. July 20, 2006). Unlike other provisions of the Act, such as

the enhanced sex offender registry, the release conditions were passed without any substantive

debate or supporting congressional reports. See, e.g., H.R. Rep. No. 109-218(1), at 23-24

(2005).  This makes clear that Congress did not even attempt to determine whether the

conditions were necessary to ensure public safety.

Magistrate Chen's decision in *United States v. Gardner*, 523 F.Supp.2d 1025 (N.D.Cal.

2007) , by its terms does not control here.  In *Gardner*, the defendant objected to the singular

addition of electronic monitoring to existing conditions that already included a curfew.  Ms.

Gardner was not restricted to her home before the monitoring nor was she after the electronic

monitoring.   The Court found that the manner in which the electronic monitoring was to be

imposed did not restrict Ms. Gardner any further than the original curfew condition.  It merely

changed the manner in which the curfew was monitored.   On this basis, the court explicitly

distinguished the facts before it from the situation in *Crowell*.

Ms. Gardner was already under curfew at the direction of Pretrial Services.  Consistent

with this Court's policies and practices, that curfew was enforced by monitoring established by

voice identification which required her to answer her home phone during the hours of her

curfew.  Under the conditions of release before electronic monitoring, its addition merely

changed the manner in which her curfew was enforced.  The monitoring, while slightly more

intrusive, did not change the substantive restrictions on Gardner's liberty.  *Gardner*, *supra*, 543

F.Supp.2d at 1030.  In this particular situation, the court was unable to conclude "that the

12

singular addition of electronic monitoring . . . is 'excessive' in light of the government's valid

interest in obtaining an additional safeguard against the risk of post-arrest criminal activity."

Ibid.

In this case, the electronic monitoring that the court has imposed, pursuant to the Adam

Walsh Act, amounts to virtually complete home confinement.  The court also imposed the

additional conditions required by the Act (no contact with minors, firearms prohibitions, and

travel restrictions).  It is thus a much more invasive restriction on liberty than the "singular

addition" of electronic monitoring to enforce an existing curfew that the court addressed in

*Gardner*.

The court therefore should adopt the reasoning of *Crowell*, and find that the mandatory

release conditions of the Adam Walsh Act, taken together, constitute excessive bail in violation

of the Eighth Amendment.

**2. Procedural Due Process**

The Due Process Clause of the Fifth Amendment provides that the government shall not

deprive a person of "life, liberty, or property without due process of law."  U.S. Const.,

Amendment V.  The term "liberty" in the due process clause "extends beyond freedom from

physical restraint. . . . the interest denominated as 'liberty' [must not only] be fundamental but

also . . . an interest traditionally protected by our society."  *Michael H. v. Gerald D.* (1989) 491

U.S. 110, 121-122.

The question of release or detention under the Bail Reform Act clearly implicates a

fundamental liberty interest.  *Salerno*, *supra*, 481 U.S. 739.  So, too, do Congressionally

mandated release conditions which significantly restrict the freedom of the person accused, but

13

1   not convicted, of a crime.  United *States v. Scott*, 450 F.3d 863 (9th Cir. 2006) (requiring waiver

2   of fourth amendment rights as a condition of pretrial release invalid).  Moreover, the "adverse

3   social consequences" of government action, such as the stigma attached to certain conditions,

4   must be considered as well.  See, e.g., *Doe v. Gallinot*, 657 F.2d 1017, 1021 (9th Cir. 1982).

5

6        The court in *Crowell* assumed without discussion that the Adam Walsh mandatory

7   release conditions -- taken together -- constitute a protected liberty interest.  The court in

8   *Gardner* did not reach this issue: "[E]ven assuming arguendo that certain conditions of release

9   would impair liberty interests cognizable under the Fifth Amendment, here what is at issue is

10  the singular addition of electronic monitoring to enforce an already imposed curfew." *Gardner*,

11  *supra*, 523 F.Supp.2d at 1032.

12

13       The mandatory release conditions, in their entirety, significantly restrict an accused's

14  freedom.  They keep him confined to his home, except when he is working or conducting his

15  necessary affairs; prohibit him from contacting entire classes of persons or from possessing a

16  firearm (a right also guaranteed by the Constitution); and require him to wear a monitor that

17  tracks his every movement.  There is considerable social stigma attached to such restrictions.

18  There can be no question that, as the *Crowell* court concluded without discussion, this

19  burdensome combination of restrictions on freedoms we all take for granted implicates a

20  traditionally recognized liberty interest.

21

22       The right to procedural due process is deeply rooted in our system of justice.  *Salerno*,

23  *supra*, 481 U.S. at 746 (citing *Mathews v. Eldridge* (1976) 424 U.S. 319, 335). "[C]onsideration

24  of what procedures due process may require under any given set of circumstances must begin

25  with a determination of the precise nature of the government function involved as well as of the

26

27

28                                                14

1  private interest that has been affected by the government action." *Goldberg v. Kelly* (1970) 397

2  U.S. 254, 263.   In addition, the court should consider the probable value of additional

3

4  procedures and the fiscal and administrative costs of such procedures.

5      [T]he identification of the specific dictates of due process generally requires consideration

6  of three distinct factors: First, the private interest that will be affected by the official action;

7  second, the risk of an erroneous deprivation through the procedures used, and the probable

8

9  value, if any, of additional or substitute procedures; and finally, the Government's interest,

10  including the function involved and the fiscal and administrative burdens that the additional or

11  substitute procedural requirement would entail.  *Mathews*, *supra*, 424 U.S. at 335.  The private

12  interest here is a significant liberty interest -- the right of those merely accused of criminal acts

13  to be free from significant and stigmatizing restraints on their personal freedom.  This right is

14

15  guaranteed by the Excessive Bail Clause of the Eighth Amendment, and given comprehensive

16  substantive and procedural protection by the Bail Reform Act.  Indeed, the mandatory release

17  conditions of the Adam Walsh Act are the only statutory restrictions on pretrial liberty that may

18  be imposed with absolutely no procedural safeguards whatsoever.

19      The risk of erroneous deprivation absent an adversary hearing is substantial.  In *Crowell*,

20

21  for example, the court had held such a hearing and found the Adam Walsh conditions

22  unnecessary.  *Crowell*, *supra*, at pp. 16-17.  Congress has determined that possession of child

23  pornography alone does not pose a significant enough risk to the community to require

24  electronic monitoring, yet its' decision to impose it upon those accused of sending a computer

25  image to another person was made with absolutely no debate, study or reporting.

26

27      Moreover, electronic monitoring, although intrusive when combined with severe

28                                         15

restrictions on movement, is ultimately a fairly ineffectual tool. If someone is inclined to commit sexual acts upon minors or solicit minors for child pornography, it seems doubtful that an ankle monitor would do much to prevent it. It is no different than monitoring an individual accused only of possessing a firearm in order to prevent him from shooting someone.

Finally, the fiscal and administrative costs associated with a hearing are minimal. Indeed, in all cases other than those covered by the Adam Walsh Act, such a hearing is required (until 2006, a hearing was required in all cases). The hearing is relatively brief, and usually occurs in conjunction with arraignment and any motion by the government for detention. In most cases, especially those falling on the less serious end of the spectrum, Pretrial Services likely would not recommend electronic monitoring and the court would simply follow this recommendation.

The court in *Crowell* found the government's interest insufficient to override "the fundamental requisite of due process of law . . . the opportunity to be heard." *Crowell*, *supra*, at p. 18. The court noted that the Supreme Court in *Salerno* upheld the Bail Reform Act because it mandated "numerous procedural safeguards [that] must attend an adversary hearing." *Salerno*, *supra*, 481 U.S. at 754. Citing the Bail Reform Act's judgment to deemphasize the use of money bonds and provide "flexibility in setting conditions of release appropriate to the characteristics of individual defendants," the court found that the Act's mandatory release conditions failed to accord an appropriate individualized evaluation. *Crowell*, *supra*, at p. 19 (quoting S. Rep. No. 98-225, 98th Cong., 1st Sess. 26 (1983)).

The Adam Walsh Amendments, by mandating certain pretrial release conditions, effectively create an irrebuttable presumption that the appearance at trial of arrestees charged

with certain crimes, and the safety of the community, cannot be reasonably assured without such conditions. "The assumption that [a defendant is] more likely to commit crimes than other members of the public, without an individualized determination to that effect, is contradicted by the presumption of innocence. That an individual is charged with a crime cannot, as a constitutional matter, give rise to any inference that he is more likely than any other citizen to commit a crime if he is released from custody." *Crowell*, *supra*, at pp. 21-22 (quoting *United States v. Scott*, 450 F.3d 863, 874 (9th Cir. 2006).

In *Scott*, the Ninth Circuit invalidated under the Fourth Amendment a pretrial release condition requiring a defendant to consent to search with less than probable cause. This holding, however, was based upon the lack of due process afforded the defendant prior to this condition being imposed:

> [I]f a defendant is to be released subject to bail conditions that will help protect the community from the risk of crimes he might commit while on bail, the conditions must be justified by a showing that defendant poses a heightened risk of misbehaving while on bail. The government cannot, as it is trying to do in this case, short-circuit the process by claiming that the arrest itself is sufficient to establish that the conditions are required.

*Scott*, *supra*, 450 F.3d at 874.

The reasoning of *Scott* controls this case. The court therefore should follow the Crowell decision, and find that the Adam Walsh Act's mandatory release conditions, taken together, violate due process.

**3. Separation of Powers**

The Constitution expressly divides the functions of power among the three branches of government. As Justice Brandeis observed, "the doctrine of the separation of powers was adopted [not] to promote efficiency but to preclude the exercise of arbitrary power." *Myers v.*

*United States* (1926) 272 U.S. 52, 293.  Maintaining functional separation among the three branches is "essential to the preservation of liberty." *Mistretta v. United States* (1989) 488 U.S. 361, 380.

This principle dates back at least as far as Madison's Federalist Papers, the foundation of much of the structural content of the Constitution.  As Madison wrote, "The accumulation of powers legislative, executive and judiciary in the same hand, whether of one, a few or many . . . may justly be pronounced the very definition of tyranny."  James Madison, *The Federalist No. 47*, at p. 324.

Thus, Congress may not enact legislation that "impermissibly threatens the institutional integrity of the Judicial Branch." *Commodity Futures Trading Comm'n v. Schor* (1986) 478 U.S. 833, 851.  Legislation that interferes with the courts' independent exercise of their judicial powers, including the consideration of relevant evidence, violates the separation of powers doctrine. *United States v. Klein* (1871) 80 U.S. 128, 146-147.

The Adam Walsh Act amendments interfere with one of the primary judicial functions: the setting of bail in criminal matters.  "Since the Constitution was adopted, the setting of bail in federal criminal cases, with minor exceptions, has been recognized as representing the quintessential exercise of judicial power." *Crowell*, *supra*, at p. 24 (citing *Stack v. Boyle* (1951) 342 U.S. 1, 4-5.  Under the Excessive Bail Clause of the Eighth Amendment, monetary bail cannot be set at a figure higher than necessary to reasonably assure a specific individual's return to court.  "The fixing of bail for any individualized defendant must be based upon standards relevant to the purpose of assuring the presence of that defendant." *Stack*, *supra*, 342 U.S. at 4 (emphasis supplied).  Setting the conditions of release are part and parcel of this function.

1
2
3

Thus, the court should follow *Crowell* in holding that the mandatory release provisions of the Act violate the separation of powers doctrine.

4
5
6
7
8
9
10
11
12

Congress has unambiguously imposed upon the federal judiciary a specific rule to be applied in determining the release of a defendant charged with specified offenses, thereby denying to the court the exercise of its judicial authority to set such conditions. In so doing, Congress has commandeered the court into acting as its agent for purposes of imposing the targeted release conditions. . . . As such, the Adam Walsh Amendments unmistakedly (sic) and unduly encroach upon the judicial function, exclusively reserved by Article III of the Constitution to the Judicial Branch, in violation of the separation of powers established by the Constitution's framework. *Crowell*, *supra*, at p. 24-25.

13
14

**CONCLUSION**

15
16
17
18
19
20
21
22

This court should exercise its discretion to remove the electronic monitoring condition on Thomas Green since it is clearly unnecessary to insure his appearance in this case. Since November 16, 2006 when Mr. Green was first contacted by the FBI he has lived a law abiding life and has posed no threat to anyone in the community. Believing since November 2006 that Mr. Green had committed the charged offenses, the Government chose not to seek an indictment until February of 2008. Surely had the Government thought Mr. Green posed a threat to the community such a delay would not have occurred.

23
24
25

Finally, the amendments to the Bail Reform Act imposed by Adam Walsh do not apply to this case for the stated reasons. If this court, however, found that the amendments do apply, it should find the amendments unconstitutional in this case.

26
27
28

19

Date: May 9, 2008                              Respectfully submitted,


                                               s/Deborah G. Levine

                                               DEBORAH G. LEVINE
                                               Attorney for Defendant
                                               THOMAS EDWARD GREEN, JR

DECLARATION OF DEBORAH G. LEVINE

I, DEBORAH G. LEVINE declare that:

1.    I am an attorney licensed to practice in the State of California and in the North District of California.

2.    I am the attorney for defendant, THOMAS EDWARD GREEN in action number CR 0800075.

3.    I prepared the attached motion to modify release conditions and filed the motion to be heard in front of Magistrate Judge Patricia Trumbull.  I appeared in Magistrate Trumbull's court on May 8, 2008 and addressed detention issues raised in the motion but was told that the issues raised in the motion should be heard in the District Court by the assigned judge.

4.    This motion is the same motion which was previously filed on May 7, 2008.  The only change is the notice of motion and hearing will now be set for hearing in the District Court.

5.    Attached to this motion are letters from people who know Mr. Green, employment evaluations and education verification which will be used in support of this request to vacate the pre trial release condition of electronic monitoring.

s/Deborah G. Levine

DEBORAH G. LEVINE
Attorney for Defendant
THOMAS EDWARD GREEN

1



OMNIUM
WORLDWIDE, INC.®

February 6, 2007

Professional Reference for Thomas E. Green

To Whom It May Concern:

I have known Tom within the business world over the last three years and have found him to be extremely knowledgeable and professional. I have interacted with Tom in business settings within his operation, as well as at national Healthcare Financial Management Association (HFMA) conferences.

Tom is extremely competent, has an excellent rapport with his peers, and is well respected within the healthcare industry. As a leader within the industry and the Healthcare Financial Management Association, I value the talent that Tom brings.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Christopher M. Vairo
Vice President, Business Development, Omnium Worldwide, Inc
Treasurer, Nebraska Healthcare Financial Management Association



STANFORD
UNIVERSITY
MEDICAL CENTER

*Stanford Hospital & Clinics*
*Lucile Salter Packard Children's Hospital*

January 19, 2007

**Re:    Tom Green**

I have known Tom Green for seven years, and not only am I his current supervisor but originally hired him into the Patient Financial Services Department at Lucile Packard Children's Hospital – Stanford University as assistant director. It has been my pleasure as Tom has demonstrated continued professional growth, the ability to take on new challenges, and exercise critical decision making to promote him to director. The promotion to director was specifically acknowledged and applauded by both the chief executive and chief operating officers of Lucile Packard Children's Hospital.

Tom's duties entail responsibility over the revenue cycle at the Lucile Packard's which accounts for over $1 billion in revenues. These responsibilities very much impact on the organization's cash flow, guest relations, and external relations. The very nature of the position requires excellent relationship building skills, in depth knowledge of the healthcare third party industry, and strong operational controls, all of which Tom exemplifies. He is well liked by his staff and well respected by his peers throughout the organization.

It is my observation that Tom is an individual that excels at excelling. He is an individual that is career minded and earnest in continuing to challenge and professionally develop himself in everywhere, thus leading to his pursuit of an MBA, despite the tremendous work load demands. Tom's example serves as an excellent role model for his staff and in turn Tom encourages and is very keen on the ongoing professional development of all those he supervises. I find Tom to be creative and like a master chess player, thinking of next moves and contingencies.

Lastly, I would want to say about Tom, what a pleasure it is to work with him and see him grow. His ability to take on more allows me in turn to delegate more to Tom, and frees me up so that I can focus attention on other parts of the organization. If an organization's greatest asset is its people, Tom is right there at the top.

Sincerely,

David Haray

# STANFORD
## HOSPITAL & CLINICS

*Stanford University Medical Center*

January 24, 2007

To whom it may concern:

I have had the distinct honor of working with Tom Green for the past 6 years. He is a person of the highest integrity and professionalism. His incite into difficult issues and problem solving is often relied upon when facing difficult business challenges. Tom communicates his message logically and clearly and often with dry humor to the delight of his audience.

I find it most amazing that Tom was able to take on a new position, get promoted in the position, and complete his masters education. This accomplishment truly shows that Tom is an extraordinary person with the will and the drive to succeed in all that he endeavors.

Sincerely,

Shoshana Williams
Stanford Hospital and Clinics
Director, Patient Financial Services
(650) 498-7215



# The Cirius Group, Inc.

*Serious Quality, Service & Performance*

January 26, 2007

Subject: Tom Green

To Whom It May Concern:

This letter is to acknowledge and confirm in my role as a current and active HFMA Board Member that I have worked with Tom Green as an active member of the HFMA Northern California Chapter for the past 6 years.

As an active member of the HFMA Northern California Chapter, he has participated as a fellow member of the Patient Financial Services committee during the past 6 years. All of these hours spent have been in the spirit of volunteering time for the promotion and education of healthcare professionals in the northern California area.

Sincerely,

Jayne Kooner
HFMA Northern California Chapter Board Member

140 Gregory Lane, #240
Pleasant Hill, CA 94523

www.ciriusgroup.com

Phone 925-681-9300
Fax    925-685-6526
E-Fax  815-333-3739



**Child Health
Corporation of America**

6803 West 64th Street, Suite 208
Shawnee Mission, KS 66202
913/262-1436 • (Fax) 913/262-1575
www.chca.com

January 18, 2007

To Whom It May Concern:

Child Health Corporation of America is a Kansas-based business alliance of children's hospitals across the country. With 42 Owner Hospitals as part of its group, CHCA represents 20,000 physicians, 100,000 employees and $14 billion in annual revenue. A number of affinity groups ("Forums") are offered through CHCA, allowing staff in similar positions at children's hospitals across the country to network, share best practices and attend educational programs by industry leaders. By creating these opportunities, the Forum groups have a measurable 20-year track record of success in improving the safety, effectiveness and efficiency of individual hospital members. Tom Green, Director, Patient Financial Services at Lucile Packard Children's Hospital in Palo Alto has for the past several years been a positive and active participant in the newest Forum to be offered: the Patient Financial Services Forum. The objective of this important group is to improve the entire revenue cycle process thereby enabling children's hospitals to achieve their financial goals; toward this end, I have been impressed with Mr. Green's responsiveness and leadership and will look forward to his continued contributions as this Forum continues into its third year of operation and beyond.

If I can provide any additional information, you may contact me at edna.rindner@chca.com or 913-262-1436 x140.

Sincerely,

Edna Rindner
Vice President, Business Process Improvement

MarketHouse Lofts Homeowner's Association
350 East Mission Street
San Jose, CA 95112

January 18, 2007

Re:    Tom Green
       CFO MarketHouse Lofts Homeowner's Association Board of Directors

Dear Sir/Madame,

Tom Green and I have served together on the Market House Lofts Board of
Directors for the last 3 years for this condo/loft community located at 350 E.
Mission St San Jose, CA, 95112.

As President, I am happy to attest to the fact that Tom's service in the role of
Chief Financial Officer has been critical and invaluable to the fiscal health and
well being of our homeowners association. He is actively involved with issues
that come before the Board and Membership. He asks the tough financial
questions, considers and advises us on their fiscal implications, all the while
monitoring the short and long term implications of our decisions.

I consider him a tremendously talented resource and Board Member.

Sincerely,

Joan DiCoio
BOD President
Market House Lofts Homeowner's Association
350 E. Mission St. #123
San Jose, CA 95112
408-279-9945

# California State University, San Bernardino

The Trustees of The California State University

upon recommendation of the faculty

have conferred upon

## THOMAS EDWARD GREEN, JR.

the degree of

### BACHELOR OF ARTS

ADMINISTRATION

faith all rights and privileges pertaining thereto.

Given at San Bernardino on the seventeenth day of June, two thousand.



Chair
Board of Trustees

Governor of California
President of the Board of Trustees

Chancellor
The California State University

President
California State University, San Bernardino

# College of the Desert

Upon the recommendation of the Faculty of

and under the authorization granted by the Board of Governors of the
California Community Colleges

the Degree of

## Associate in Arts
### Business Administration

is hereby conferred upon

## Thomas Edward Green, Jr.

for the satisfactory completion of a two-year curriculum
with all rights and privileges thereto pertaining

Given at Palm Desert, California, this twenty-third day of July,
nineteen hundred and ninety eight.

Ray House
President Board of Trustees

William R. Kroonen
President of the College

# Healthcare Financial Management Association

## This Certifies That

### Thomas E. Green

HAVING SUCCESSFULLY PASSED THE EXAMINATION AND REQUIREMENTS PRESCRIBED

BY THE BOARD OF EXAMINERS OF THE ASSOCIATION IS DECLARED A

## Certified Healthcare Financial Professional

*SPECIALTY IN PATIENT FINANCIAL SERVICES*

BY THE

### HEALTHCARE FINANCIAL MANAGEMENT ASSOCIATION

GIVEN ON THIS 10TH DAY OF SEPTEMBER 2003



Attest:

_____
President

_____
Chairman of the Board

_____
Chairman, Board of Examiners



# hfma

healthcare financial management association

**RICHARD L. CLARKE, FHFMA**
President and CEO

April 8, 2003

Thomas E. Green
1149 Bird Avenue Apt 2
San Jose, CA 95125-1733

Dear Mr. Green:

I was pleased to learn that you have successfully completed both sections of the HFMA Certified Healthcare Financial Professional examination with a specialty area in Patient Financial Services. Congratulations on behalf of the Board of Examiners, the Board of Directors, and all of HFMA. While passing the examination is a major accomplishment, I encourage you to complete the remaining requirements for certification as soon as possible. Please feel free to submit your application at your convenience. Applications will be processed on an on-going basis.

Again, I urge you to actively pursue completion of the remaining requirements for certification. To facilitate completion of your requirements for certification, visit our website at www.hfma.org where you will find a certification application. All sections of this application must be completed before your application can be acted upon. You have a maximum of three years from the date you successfully complete all sections of the exam to complete the entire certification process. If you have any further questions, or if you need any assistance, please feel free to contact Bernadette Clark, Certification Associate at 1-800-252-HFMA, ext. 311.

You have good reason to be proud of your accomplishment.

Best wishes for your continued success.

Sincerely,

Richard L. Clarke, FHFMA
President and CEO

# 70.00 paid

Two Westbrook Corporate Center, Suite 700
Westchester, Illinois 60154-5700
tel 708.492.3600 · fax 708.531.0032
web www.hfma.org

Lucile Salter Packard
Children's Hospital

STANFORD UNIVERSITY MEDICAL CENTER

CHRISTOPHER G. DAWES
President and Chief Executive Officer
725 Welch Road
Palo Alto, CA 94304

TOM

CONGRATULATIONS ON
PASSING THE HFMA, CHFP
EXAMINATION.

Chris

San Jose State University
luate Studies and Research

Please type only.

# Departmental Request
# For Candidacy and
# Graduate Degree Program


San José State
U N I V E R S I T Y

**GREEN**
Last Name

**THOMAS, E**
First Name, M.I.

**004289104**
SJSU ID

**350 E. MISSION ST. #206**
Home St. Address

**SAN JOSE, CA 95112**
City, State, Zip Code

**408.294.1352**
Home Phone

**650.497.8357**
Daytime Phone

**TGREEN@LPCH.ORG**
Address

Prerequisites/Comments

| Dept. | No. | Grade | Sem. Comp. | Waived |
|-------|-----|-------|-----------|--------|
| BUS | 200 | A | | |
| BUS | 201 | A- | | |
| BUS | 202 | A- | | |

Faculty Advisor Signature

Date

Dept. Graduate Advisor Signature

Date

**Approved for University
Graduate Committee** ☐

Evaluator
Graduate Studies and Research

Date
April 10, 2006

| | | | |
|---|---|---|---|
| MA ☐ | | MS ☐ | |
| MBA **X** | | MFA ☐ | |
| MLS ☐ | | MUP ☐ | |
| MSW ☐ | | MPA ☐ | |
| MPH ☐ | | Other ☐ | |

Degree Major
**MBA**

Concentration

Plan
☐ a) Thesis (200 units Req.) **X** b) Non-Thesis Plan

Competency In Written English
**BUS 210**
Date Completed:

Change of Classification:

Date Submitted:

Previous College Degree:
Institution: California State University
San Bernardino
Degree: BA, Bus. Administration
Date: May, 2000

## Proposed Graduate Degree Program
### A. Courses Within the Department

| Dept. | No. | Title | Sem. Units | Grade | Sem. Comp. |
|-------|-----|-------|-----------|-------|-----------|
| BUS | 210 | Developing & Managing People | 3 | | |
| BUS | 220 | Accounting Principles | 3 | B+ | |
| BUS | 230 | Marketing Management | 3 | B | |
| BUS | 270 | Financial Management | 3 | B | |
| BUS | 250 | Law & Ethics | 3 | | |
| BUS | 260 | Decision Analysis | 3 | | |
| BUS | 240 | Electronic Commerce | 3 | A- | |
| BUS | 224 | Financial Statement Analysis | 3 | A- | |
| BUS | 262 | Leadership | 3 | B+ | |
| BUS | 253 | Conflict Management | 3 | | |
| BUS | 298 | Individual Study | 3 | | |
| BUS | 298 | Individual Study | 3 | | |

### B. Culminating
Dept.

| | | | |
|---|---|---|---|
| BUS | ☐ 299 Thesis *(indicate Units)* ☐ 298 Project: *(indicate Units, Semester)* **X** **290 Course:** *(indicate Units, Semester, Course No)* ☐ Culminating Experience Report | 3 | |

### C. Courses in Other Departments

| Dept. | No | Title | Sem. Units | Grade | Sem. Comp. |
|-------|-----|-------|-----------|-------|-----------|
| | | | | | |

### D. SJSU Extension or Transfer Resident Courses
Transfer Credit must be validated for use at SJSU

| School | Dept. | Crse. | Title | Sem. Units | Grade | Sem. Comp. |
|--------|-------|-------|-------|-----------|-------|-----------|
| | | | | | | |

Total Units
A: 36   B: 3   C:   D:   Total: 39

### Candidacy for the Degree—Office Use Only

| Graduate/SJSU | Date | Sem. Units | G.P.A. | Total |
|---------------|------|-----------|--------|-------|
| | | | | |

San José State University
**Graduate Studies and Research**

# Application for Award of Master's Degree



San José State
UNIVERSITY

Student Information:

# GREEN
Last Name

# THOMAS, E.
First Name, M.I.

## 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
Social Security Number

## 004289104
Student I.D. Number

Home Address:

## 350 E. MISSION ST. #206
Address

## SAN JOSE, CA 95112
City, State, Zip Code

## (408) 294-1352
Home Phone

## (650) 862-5270
Daytime Phone

## TGREEN@LPCH.ORG
Email Address

Address to Send Diploma:

## SAME AS ABOVE
Address

_____
City, State, Zip Code

| Today's Date |
|---|
| 08/29/06 |

Degree Type:

| MA ☐ | MS ☐ | MBA ☒ | MFA ☐ |
| MUS ☐ | MUP ☐ | MSW ☐ | MPA ☐ |
| MPH ☐ | MAT ☐ | | |

Planned Graduation Date
05/26/07

Major **BUSINESS ADMINISTRATION**

Print Full Name As It Will Appear On Your Diploma (Print Legibly):

## GREEN, JR.
Last Name

## THOMAS EDWARD
First Name, M.I.

Print Full Name As It Appears In Your Official SJSU Records:

## GREEN
Last Name

## THOMAS, E.
First Name, M.I.

Degrees Now Held

| Degree | Institution Granting | City, State, Country | Month/Year |
|---|---|---|---|
| BA | CAL STATE | PALM DESERT, CA | 05/00 |

**For Office Use Only – Do Not Write Below This Line**

Thesis _____

Binding _____

Transferred Graduate Credit _____

Comprehensive _____

Final GPA _____

Total Graduate Units _____

To Do:

_____
Completion of Requirements Certified Personnel          Date

revised f0803

Final Grades

Thomas Green

go to ...

## ew My Grades

**Select Term** Spring 2007    change

**My Grade Report > Spring 2007 > Graduate > San Jose State University**

| Course | Class Name | Official Grade | Units |
|--------|-----------|----------------|-------|
| BUS  200W | Managerial Comm | | 3.00 |
| BUS  21S | Quant & Qual Prob | | 3.00 |

**Courses Attempted  2**

| GPA, Grade Points, and Unit Totals | Current | Cumulative |
|-----------------------------------|---------|------------|
| Units In Progress - GPA | 6.000 | 6.000 |
| Units Taken Toward GPA | 0.000 | 42.000 |
| Units Taken Not Toward GPA | 0.000 | 0.000 |
| Units Passed Toward GPA | 0.000 | 42.000 |
| Grade Points | 0.000 | 151.200 |
| Current GPA | 0.000 | 3.600 |

| Term | SJSU Cumulative GPA | | Term | Academic Standing |
|------|--------------------|---|------|-------------------|
| Fall 2006 | 3.600 | | Fall 2006 | Good Standing |
| Summer 2006 | 3.558 | | Summer 2006 | Good Standing |
| Spring 2006 | 3.470 | | Spring 2006 | Good Standing |
| Fall 2005 | 3.550 | | Fall 2005 | Good Standing |
| Summer 2005 | 3.567 | | Summer 2005 | Good Standing |
| Spring 2005 | 3.600 | | Spring 2005 | Good Standing |
| Fall 2004 | 3.850 | | Fall 2004 | Good Standing |

go to ...

PRINTER FRIENDLY VERSION

**Review – Tom Green – 12/29/06**

Overall rating: ES: Meets and Often Exceeds

FY 2006 has proved to be another eventful and successful year for Tom, filled with challenges both anticipated and not anticipated. We started off the fiscal year with a front end conversion to CERNER which coupled with Medi-Cal payer mix increase (approached 40% for the year), price increase, and ongoing adjustment to CCS Enhancement 47 conversion spiked the days to 79.3. The fiscal year ended at a remarkable 68.7 with overall average days being at 75.7 through the year (see attached graph). We also met our cash goal for the year with a an excess of $4.3m (see attached graph). What I am most pleased about Tom's ongoing professional development is his continued demonstration of operation control and oversight. Tom's sustained efforts in this regard resulted in his promotion to Director of Patient Financial Services, a promotion both welcomed and acknowledged by the CEO and COO.

FY06 Goals

1. Meet/beat cash targets
2. Maintain days minimally < 75, and ideally < 70.
3. Meet/beat budget
4. Meet/beat Trac goals
5. Participate in successful conversion of frontend to CERNER
6. Complete CCS Enhancement 47 conversion
7. Implement a denials management system
8. Oversee successful transition of NCO to Atlanta
9. Improve scores on selected Gallup Survey questions
10. Meet or beat any established children hospital scores where applicable and where there is sufficient lead time, if warranted to make any process improvements, i.e., deploy and execute on any corrective action plans
11. Continue to develop Medi-Cal supervisor
12. Continue to have a "succession" plan for possible CCMC supervisor turnover

Tom successfully addressed the goals stated above including participating in the selection and replacement of a new outsourcer for LPCH, namely USCB.

FY2007 Goals

1. Meet/beat cash targets
2. Barring any unforeseen internal or external system or payer changes, end fiscal year at or below 70.
3. Meet/beat budget excluding additional FTE expense required for CERNER and Medi-Cal payer mix change.
4. Oversee the successful operations of USCB outsourcing and oversight of USCB meeting its Dashboard (Report Card) interim goals
5. Successful implementation of AB774

6.   Successful implementation to NPI enumeration.
7.   Continued improvement of Gallop scores
8.   Successful implementation of UB04 if launched.
9.   Demonstrated strengthening of Medi-Cal Unit as reflected in strength of supervision and staff in light of increasing Medi-Cal payer mix.
10.  Overall control of the accounts receivables as demonstrated by making sure that the appropriate work standard is being adhered to for all dollar amounts.
11.  By fiscal year end, determine what it would take to assume CDM oversight.
12.  Strategically plan for right-sizing and system changes in light of:
     a.   Ongoing CERNER challenges
     b.   Medi-Cal system and payer mix challenges
     c.   Additional capacity and workload challenges with new OR's and beds coming online
     d.   Possible upgrade to Trac 4.0
     e.   Expanding use of NDC
13.  Continued demonstrated strengthening of front end relationships through feedback reports to Admitting, HIM's, PDC, Pharmacy, etc.
14.  In Tom's first full year as director, I expect to see him demonstrate control and oversight over all aspects of operations and accounts receivables control so that there are no surpises in terms of:
     a.   ATB analysis
     b.   Trac
     c.   Cirius edits
15.  Ongoing monitoring of AIP goals leading to successful completion.

Tom is an excellent director, always looking for ways to improve himself and his staff. I believe Tom does a great job of having a "plan B or a plan C" to fall back on. This creativity and anticipation has served him well. FY 2007 will be full of challenges, anticipated growth, the need to adapt and be proactive. The goals outlined for FY 2007, while numerous, really asks Tom to focus and concentrate on continued strengthening of revenue cycle operations and staffing. I believe LPCH is in the best of hands with Tom's stewardship as he continues to lead LPCH Revenue Cycle to best practices.

David Daray                                    Tom Green

**Review – Tom Green, 9/3/04**

Overall rating: ES: Meets and Often Exceeds

I concur with Tom's document of accomplishments and goals. FY04 results continued to sustain and improve on our Revenue Cycle results of the previous years. We are ending FY03 at 68.5 days in A/R. This represents a 3 day reduction from where we started this fiscal year, i.e., 72 days in A/R. This has been achieved by improvements all along the Revenue Cycle resulting in collecting nearly $23 million over and above our targeted goal (see attached graphs). This could not have been achieved without the key work that Tom and his staff performed throughout the year.

Tom has accomplished all his FY04 goals with the exception of benchmarking as there is no established Children Hospital benchmarking data in which to compare. (FY04 goals attached).

The only addition to his FY05 goals I would add and we have discussed is continued focused coaching of the Medi-Cal supervisor in terms of pro-active analysis of her areas of responsibilities and the ability to present the results of such analysis in a summary form. Tom continues to work with this individual and has paired her with one of his supervisors. I would like to see continued progress along those lines.

Tom continues to strengthen his staff and management. As our re-engineering consultants have cited, two things undo a Revenue Cycle: 1) computer conversion and 2) management turnover. We have maintained stable systems and Tom has had no management turnover and very little staff turnover. This makes for both seasoned and strong staff which continues to drive results. Tom has also undertaken the pursuit of his MBA which I admire very much and demonstrates his fervent ambition to grow and advance within his profession and LPCH. As I have commented often to the executive group, Tom has assembled the strongest PFS group LPCH has ever seen, which is no small accomplishment. The CEO, COO, and CFO recognize Tom for his individual contributions, talent and commitment to the mission and vision of LPCH.

Having said that, FY05 is filled with daunting challenges:

1. Cerner Computer Conversion of front end
2. CCS System conversion impacting 30% of our A/R
3. Billing for more technical charges coming from the clinics

I had a CFO tell me that you can tell how well a person does his job by how well the department runs when he is not around. The department runs with excellent efficiency when I am not there and were Tom not there, I do believe it would function with proficiency, great teamwork and responsibility which is all reflective of Tom's leadership and mentorship.

I know the ability to work with Tom contributes greatly to my job satisfaction here and LPCH is fortunate to have an individual of his talent and dedication.

David Haray

Tom Green

**Review – Tom Green, 8/28/03**

Overall rating: ES: Meets and Often Exceeds

I concur with Tom's evaluation. FY03 results continued to sustain and improve on our Revenue Cycle results of the previous year. We are ending FY03 at 72 days in A/R. This represents a 10 day reduction from where we started this fiscal year, i.e., 82 days in A/R. This has been achieved by improved cash collections and collecting nearly $20 million over and above our targeted goal (see attached graphs). This could not have been achieved without the key work that Tom and his staff performed throughout the year. As to further comments on Tom's FY03 accomplishments I would like to add the following:

1. Responding to all CMCC audits including the Organ Acquisition Audit
2. Establishing an internal systems committee which has improved our electronic billing
3. Meeting and beating budget targets
4. Meeting and beating Trac targets and continuing a trend to revise targets down
5. I believe Tom has demonstrated good skills and decision making in re-organizing the department and bringing up to full functioning the RMS Unit as well as working with his supervisor to develop a monthly report as feedback to Gary May and Contracting
6. Tom also has worked well with Finance in helping with looking at write-offs and reserves as well as making more efficient the clinical trial write offs and tracking

This also has been a significant year for Tom in leading the department on three fronts:

1. Leading the department and development his own management team
2. Working with his peers within LPCH in cross-department initiatives
3. Tom's own professional and skill set growth

To say the least Tom has had to learn a lot quickly and this year has been exponential in terms of both challenges and growth opportunity. I have challenged him to begin interacting in cross-departmental responsibilities and as cited, Tom has participated in and guided several key task forces and initiatives. Tom has taken upon the responsibility of reporting out at the Revenue Cycle and gained positive visibility with members of the executive team.

As to FY04 Goals I would like to add:

1. Meet/beat budget targets
2. Meet/beat Trac targets
3. Days: Threshold, 73-75, target 70-72, stretch <70
4. Continue to develop his supervisory team and take advantage of all new DDI supervisory courses being offered

5.  Begin to work with Decision Support to establish any industry-wide benchmarks and peer metrics
6.  Participate in the successful upgrade of Meditech 4.9
7.  Evaluate and implement, if appropriate Stockamp 3.0 Focus tool
8.  Work with Finance to continue to improve cross department coordination in terms of reserve analysis and trancode mapping
9.  Continue to revise Trac goals, with particular emphasis at arriving at a better understanding of DNB
10. Complete deployment of patient friend billing/statement project to include selection of statement vendor
11. Benchmark patient satisfaction score with threshold, target, and stretch goals
12. Participate in HIPAA transaction transition

I applaud Tom's commitment towards continued professional growth both personally and his want and desire to grow in his career and take on more responsibility. As it is true for me, it is true for Tom that assuming more responsibility is only possible by making his direct reports and staff strong, independent, and by his staff buying into a shared vision and goals are able to continue to advance them when Tom is not present. It is a professional pleasure to work with Tom and foster his continued development.


_____                    _____
David Haray                                    Tom Green

# Certificate of Appreciation

This certificate is awarded to

*Tom Green*

In recognition of your valuable contributions as a member of the Patient Friendly Billing Statements Team

## STANFORD
HOSPITAL & CLINICS

*Stanford University Medical Center*

Martha H. Marsh, President and CEO

11/3/05

Date

The Board of Directors of Lucile Packard Children's Hospital
is proud to present this

# Certificate of Exemplary Service

## Patient Financial Services

to

For extraordinary efforts and outstanding accomplishments
Resulting in significant contributions
To support the mission of Lucile Packard Children's Hospital
for patient care, education, and research.

Presented this third day of May, 2002

John Freidenrich
Chair, Board of Directors
Lucile Packard Children's Hospital

Christopher Dawes
President and CEO
Lucile Packard Children's Hospital